**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 21, 2020

**BY CM/ECF**
The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re:   *United States v. Davonte Brown*, S2 20 Cr. 135 (JMF)

Dear Judge Furman:

The Government writes to briefly reply to Defendant Davonte Brown's opposition to the Government's request to revoke bail and order the defendant's detention pending trial (Docket No. 99). In his opposition, the defendant attempts to downplay the significance of the evidence found on his cellphone—direct evidence of the defendant's illegal possession of firearms, possession of large quantities of marijuana and drug trafficking paraphernalia, and an intent to flee in the face of serious federal charges. But these attempts at minimizing the defendant's danger to the community and risk of flight are unpersuasive, especially in light of all of the evidence in the record. Similarly, the Court should reject the defendant's argument that he cannot be detained because of the COVID-19 pandemic. The defendant raises this argument without suggesting that he suffers from any pre-existing health conditions that would make him more likely to contract a life-threatening case of COVID-19. In any event, the Bureau of Prisons has been taking appropriate steps to control the spread of COVID-19 in its facilities. As a result, the Government respectfully submits that there is no set of conditions that can reasonably assure the safety of the community or the defendant's appearance in court.

### I.   Safety of the Community

At the outset, the defendant continues to dispute that he possessed the firearm seized by law enforcement on the night of his arrest on March 19, 2020 (the "Seized Gun")—despite the photographs on the defendant's phone that depict a gun with essentially all of the same physical features as the Seized Gun. (Docket No. 99 at 2). As the photographs in the Government's motion show, the matching physical features between the Seized Gun and the photographs on the defendant's cellphone include an insignia on the grip of the gun, the letters "TCP" on the side of the gun, the grooves on the rear of the gun, and the extended magazine that is longer than the handle of the gun. These photographs are powerful evidence of the defendant's possession of the Seized Gun. Combined with law enforcement testimony that the Seized Gun was found inside a

pouch in a car located directly in front of where the defendant was arrested, the evidence at trial will be overwhelming that the defendant possessed the Seized Gun.

The defendant also argues that his possession of a gun on the night of his arrest suggests that he is no greater danger than a "gun enthusiast" or a "typical NRA member." He similarly argues that his possession of marijuana is not inconsistent with personal use. (Docket No. 99 at 3). But the defendant fails to view this evidence in light of all the other evidence in the record—including his prior felony conviction for a serious drug trafficking offense in Maryland, his participation in a shooting in a residential neighborhood in November 2015 that caused injuries to an innocent bystander, his participation in a large-scale narcotics conspiracy, his two prior arrests for illegal gun possession in 2016 and 2018, the photographs on his cellphone showing marijuana packaged for sale and sitting on a scale—including photographs of a second gun placed next to marijuana—and his membership in a violent Bloods street gang that is responsible for multiple murders, attempted murders, slashings, and gunpoint robberies since at least 2011. To be sure, any one of these individual facts can be downplayed or rationalized, as the defendant has unpersuasively attempted to do in his opposition. But viewing the record as a whole, the defendant's possession of a loaded firearm with an extended magazine on March 19, 2020 in a vehicle with three other individuals—given his criminal history and the serious charges he is facing in the Indictment—is extremely alarming. The record as a whole also strongly suggests that the defendant has been repeatedly engaging in criminal activity from at least 2014 through the moment of his arrest last month. As a result, the Government respectfully submits that there is no set of bail conditions that can reasonably assure the Court that the defendant will refrain from committing additional crimes while released in the community.

## II.  **Flight from Prosecution**

Next, the defendant attempts to describe the text message exchange on his cellphone with CC-1 as "ambiguous" regarding the reason for the defendant's flight from New York City. (Docket No. 99 at 4). According to the defendant, the text message exchange represents an offer from CC-1 for a place to stay outside of New York City during the COVID-19 pandemic. This cannot be farther from the truth. When the defendant was talking about his intentions to "lay low" and be "on the run," he was not talking about running away from COVID-19. For starters, the text messages between CC-1 and the defendant on March 18, 2020—the day when the indictment in this case was unsealed—contain numerous references to the charges in this case without any mention of the COVID-19 pandemic. For example, just minutes before CC-1 offered to provide housing to the defendant, CC-1 stated: "Yo moe you good" | "I saw that sh*t" | "Ni**as got reck on some sh*t and your names in that sh*t to."[1] Similarly, just a few minutes after the defendant told CC-1 that he was going to be "on the run," CC-1 stated: "It says in the article that they tried to body another ape and didn't get him he probably ratted on em." In another message, CC-1 stated: "It says wher your name is and the other ni**as 10 to life"—a clear reference to the penalties that the defendant is facing. Simply put, the defendant cannot seriously argue that he was talking about anything other than being "on the run" from the criminal charges that he is facing in this

---

[1] As the Indictment in this case indicates, the name of the lead defendant is Alexander Arguedas, a/k/a "Reckless." The Government expects that witnesses will testify that "Reck" is one of the shorthand ways that members of BSGG referred to Arguedas.

case. Additionally, the defendant's incentives to flee will only increase as this case proceeds closer to trial.

### III.     The COVID-19 Pandemic

Finally, the defendant argues that he cannot be detained at this time because of the COVID-19 pandemic. Importantly, the defendant advances this argument without making any specific claim that he suffers from any pre-existing health conditions that render him particularly vulnerable to COVID-19. Instead, the defendant claims, in essence, that COVID-19 poses a threat to *everyone* in BOP custody. As a result, acceptance of the defendant's argument would mean that the doors of every BOP facility in the nation would have to be flung wide open and no one could be detained, regardless of the danger to the community and the risk of flight that they posed. *See United States v. Acosta*, 19 Cr. 848 (NRB) (S.D.N.Y.) (Doc. No. 14 at 2) (March 25, 2020) ("[A]cceptance of the argument that this defendant should be released given the COVID-19 virus would logically result in the wholesale release of inmates.").

Numerous courts in this district have rejected similarly-formulated bail applications based on generalized apprehensions about the COVID-19 virus. *See United States v. Vincent*, 20 Cr. 78 (S.D.N.Y. Mar. 30, 2020) (Torres, J.) (rejecting bail application for inmate detained in MCC raising generalized concerns with exposure to COVID-19); *United States v. Acosta*, 19 Cr. 848 (S.D.N.Y. Mar. 25, 2020), ECF No. 14 (Buchwald, J.) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus); *United States v. Herman Steward*, 20 Cr. 52 (DLC) (S.D.N.Y. Mar. 26, 2020) (Cote, J.) (denying bail application for 62-year old inmate and finding no reason that the defendant's release would lessen the risk to his health presented by COVID-19); *United States v. Gamoneda*, 20 Cr. 109 (JGK) (S.D.N.Y. Apr. 10, 2020) (denying bail application for inmate detained at MCC based on generalized concerns about exposure to COVID-19); *United States v. Sadi Fofana*, 19 Cr. 447 (DLC) (S.D.N.Y. Mar. 30, 2020), ECF No. 66 (denying bail pending sentencing for inmate with asthma); *United States v. Chambers*, 20 Cr. 135 (JMF) (S.D.N.Y. Mar. 31, 2020) (Furman, J.) (denying bail application for inmate detained at Essex County Jail with asthma diagnosis); *cf. United States v. Perez*, 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (ordering release of defendant with serious progressive lung disease and other significant health issues in light of COVID-19 under 18 U.S.C. § 3142(i)).

In any event, it is simply untrue that the MCC (or the BOP generally) is unwilling or unable to address COVID-19. There is also no reason to believe that the BOP is performing worse than the general population of the City, where people continue to violate shelter-in-place directives and flood area hospitals. The Bureau of Prisons generally and the MCC specifically, are well-prepared to handle the risks presented by COVID-19 and other health issues. The BOP has implemented national measures to mitigate the spread of COVID-19 within prisons. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. The Government has been informed by the BOP that it is prepared to handle the risks posed by COVID-19, as with other infectious diseases and other medical conditions. Since at least October 2012, BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources, available at https://www.bop.gov/resources/health_care_mngmt.jsp. Moreover, beginning approximately two

months ago, in January 2020, BOP began to plan specifically for coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid- 19.jsp. As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id*. In addition, BOP established "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id*.

On Friday, March 13, 2020, the BOP, in coordination with the Department of Justice ("DOJ") and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id*. BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id*. For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id*. On April 1, 2020, BOP implemented Phase Five of its COVID-19 action plan, which will keep all inmates secure in their cells and quarters for a 14-day period to minimize the spread of the virus.

Moreover, as part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id*. Additionally, staff members and contractors are screened upon entry, including taking each individual's temperature, asking each individual a series of health-related questions, and denying entrance to the institution by anyone who poses a health risk. Inmates exhibiting flu-like symptoms are separated from the general population and tested for COVID-19 in accordance with local health authority protocols.

These and other steps were outlined in a March 18, 2020 letter from the BOP to Chief Judge Colleen McMahon in response to questions regarding the MCC and MDC's institutional responses to COVID-19. The institution's swift action and strict containment and mitigation measures to date undermine the defendant's suggestion that the MCC is ill-prepared to manage COVID-19.

Hon. Jesse M. Furman  Page 5
April 21, 2020

\* \* \* \* \*

      For the reasons set forth above and in the Government's motion dated April 17, 2020, the Government respectfully submits that the Court should revoke the defendant's bail and enter an order of detention pending trial pursuant to the factors set forth in Title 18, United States Code, Section 3142(g).

                Respectfully submitted,

                GEOFFREY S. BERMAN
                United States Attorney

By:    /s/ Andrew K. Chan
       Andrew K. Chan / Danielle R. Sassoon
       Brandon Harper / Jaclyn S. Wood (SAUSA)
       Assistant United States Attorneys
       Southern District of New York
       (212) 637-1072 / 1115 / 2209

cc:    Counsel of record (by CM/ECF)